UNITED STATES DISTRICT COURT    FILED
FOR THE DISTRICT COURT OF NEW MEXICO

EDWIN CHAVEZ, JR.,

      Plaintiff,

v.

DOÑA ANA COUNTY DETENTION CENTER
as an agent of DOÑA ANA COUNTY, BOARD
OF DOÑA ANA COUNTY COMMISSIONERS,
AND JOHN DOES I-V,

      Defendant(s).

06 SEP -5 AM 9:29

CIV 06-818

Case No. CIV 2006-____

Judge: _____

DON J. SVET

Lourdes A. Martinez

## COMPLAINT FOR DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990; RETALIATION PURSUANT TO SECTION 503 OF THE AMERICANS WITH DISABILITES ACT OF 1990; VIOLATION OF PROCEDURAL DUE PROCESS; VIOLATION OF SUBSTANTIVE DUE PROCESS; TORTUOUS INTERFERENCE WITH AN EMPLOYMENT RELATIONSHIP, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff resides at 2330 Saturn Circle, Las Cruces, New Mexico 88012 in Doña Ana County.

2. Defendant Doña Ana County Detention Center, hereinafter "Detention Center," which is located at 1850 Copper Loop, Las Cruces, New Mexico 88005 in Doña Ana County is a private employer in an industry affecting commerce within the meaning of the Americans with Disabilities Act of 1990, 42 U.S.C. Section 12111(5)(A) (1990), employs in excess of fifteen (15) employees and has for the past twenty (20) pay periods, and did so at the time of the incidents complained of herein.

3. Defendant Board of Doña Ana County Commissioners, hereinafter "the County" is headquartered at 845 N. Motel Boulevard, Las Cruces, New Mexico 88007 in Doña Ana County.

4. Detention Center is operated through the County's general fund and Detention Center's employees are employed by the County; therefore, Detention Center is the County's agent.

I

5. Plaintiff was employed by Defendants at the time of the incidents complained of herein.

6. Plaintiff was first employed by Defendants on or about May 21, 1986 and was terminated on or about December 9, 2005.

7. At the time of the incidents complained of herein, Plaintiff was employed as Sergeant.

8. Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission, hereinafter "the EEOC," on or about February 16, 2006 which bore EEOC Charge Number 453-2006-00412.

9. Plaintiff received the Right to Sue Letter from the EEOC on or about June 10, 2006.

10. This action is brought pursuant to various provisions of the Americans with Disabilities Act of 1990, 42 U.S.C. Sections 12101 et. seq. (1990).

11. Venue is proper in this District because acts which gave rise to this lawsuit occurred in this District, Plaintiff is currently resides in this District, Defendants are currently located in this District, and the unlawful employment practices complained of herein occurred in this District.

## PERTINENT FACTS

12. Plaintiff is a Hispanic male, fifty (50) years of age, who is currently in remission for kidney cancer.

13. Plaintiff was initially hired by Defendants as Detention Officer and was promoted to Sergeant within two (2) years of employment.

14. Plaintiff made a complaint to Herman Hernandez at OSHA on or about November 11, 2003 that the bullet proof vests that were supplied to Detention Center's transport officers were inadequate.

15. The new bullet proof vests were not delivered to Detention Center until on or about August 2004, approximately nine (9) months after the initial complaint was made to OSHA.

16. Major Chris Barela harassed Plaintiff for contacting Mr. Hernandez about the vests.

17. Plaintiff ordered an ink cartridge for the copy machine in the multi-purpose room of Detention Center; however, Major Barela told Paula Jurney, the warehouse manager, not to allow the order because it was for Plaintiff's "personal machine and the County would not pay for it."

18. Plaintiff confronted Major Barela about refusing the order for the toner and Major Barela escorted Plaintiff to the office of Detention Center's administrator, Dave Wooly.

19. On or about September 2004, Major Barela transferred Lieutenant Alatorre to Detention Center's transport division in order to remove all of Plaintiff's authority.

20. When Major Barela left Mr. Wooley's office Plaintiff had to opportunity to explain to Mr. Wooley the retaliation that had been going on by Major Barela against Plaintiff.

21. Mr. Wooley asked Plaintiff to give him two (2) weeks to resolve Plaintiff's concerns with Major Barela and Plaintiff agreed.

22. Two (2) weeks passed and nothing was done by Mr. Wooley.

23. There was another meeting between Plaintiff, Major Barela, and Ed Fridenstine at which Major Barela said that his behavior toward Plaintiff would continue.

24. Further, Major Barela and Mr. Fridenstine told Plaintiff that they did not think he had a case for retaliation.

25. Plaintiff submitted the document entitled "Concerns about Major Barela's behavior," that is attached hereto as **Exhibit A**, to Herman Hernandez at OSHA.

26. Plaintiff never received any response from Mr. Hernandez regarding his complaints about Major Barela to OSHA.

27. On or about June 6, 2005, Plaintiff obtained a doctor's note and then made a request for work boots with padded insoles based on the doctor's note.

28. As of July 19, 2005, Plaintiff had still not received the requested work boots, even after he made multiple inquiries as to when they would arrive.

29. On or about August 11, 2005 Sergeant Todd Tellez was accused of kicking a restrained inmate.

30. Sergeant Tellez asked Plaintiff to testify on his behalf at his pre-termination hearing, which Plaintiff agreed to do.

31. After Plaintiff testified on Sergeant Tellez's behalf, Plaintiff was told by Major Cheryl Roach that he was not allowed to have coffee with Officer Graczyck anymore.

32. However, Sergeant Tellez and Lieutenant Charlie Mashburn were not given the same restrictions.

33. Plaintiff feels that some of the retaliation that he has experienced stems from the fact that he testified on behalf of Sergeant Tellez.

34. It was at this point that Plaintiff felt like Detention Center was looking for a reason to terminate his employment.

35. On or about the last week of September 2005, all Detention Center employees were required to go to an orientation for the new insurance policies they had to enroll in a week later.

36. If any employee failed to enroll in the insurance at that time, they would have to wait a full year before they would have another opportunity to enroll.

37. The insurance forms were collected at this orientation.

38. At that time, Plaintiff had been going through a divorce for the past two (2) years which was scheduled to be finalized approximately two (2) weeks later.

39. Plaintiff had been legally separated from his wife since 2003.

40. Plaintiff was living with his domestic partner and her children, sharing personal finances, utility bills, cellular phone bills, car insurance, and rental obligations since on or about July 17, 2004.

41. Plaintiff explained his living situation to the woman at the insurance orientation in detail and she advised him to go ahead and claim his domestic partner and her children on his insurance policy and that there would not be any problems.

42. Plaintiff filled out all of the required insurance paperwork and submitted it to Janeen Smith at the County at which time Ms. Smith stated "if there is anything wrong or we need any additional information, we will contact you."

43. Plaintiff never heard another word about the insurance application until he was given the Notice of Intent to Terminate Employment dated October 14, 2005 that is attached hereto as **Exhibit B.**

44. Plaintiff was not given the opportunity to correct or modify his insurance application as promised by Ms. Smith.

45. Detention Center never followed the progressive discipline procedures that are outlined in the County's Progressive Procedures manual. Plaintiff was just immediately thrown into the termination process.

46. Five (5) other employees were accused of insurance fraud.

47. Upon information and belief, only Plaintiff was terminated.

48. On or about November 15, 2005, Plaintiff had his pre-termination hearing at which Sue Padilla, the Hearing Officer, Jim Caldwell, the County's Attorney, Arturo Rodriguez, the County's Personnel Director, Vicki Lusk, the County's Personnel Officer, and Plaintiff's domestic partner, Michelle Armendariz, were present.

49. Plaintiff had requested, prior to the pre-termination hearing, that Major Cheryl Roach and that County Manager Brian Haines be present at the hearing as witnesses for Plaintiff.

50. Jim Caldwell would not produce the County Manager and stated that there was nothing that Plaintiff could ask him that would be of any relevance to the proceedings.

51. Jim Caldwell was not even aware of the questions that Plaintiff intended to ask the County Manager.

52. At the pre-termination hearing, questions were asked of Plaintiff; however, he was never given the opportunity to present his own case, he was just allowed to answer the questions that were asked.

53. Plaintiff attempted to give the Hearing Officer a copy of his Final Divorce Decree; however, Ms. Padilla stated that Plaintiff should have given that to the County at an earlier date and would not enter the document into evidence.

54. At the conclusion of the hearing, Plaintiff asked for a copy of the tape of the hearing and a copy of the findings that Ms. Padilla would present to the County Manager prior to his final determination.

55. Jim Caldwell stated that Plaintiff was not entitled to a copy of either of the requested items.

56. Around the time that Plaintiff's pre-termination hearing took place, Plaintiff learned for a fact that he had kidney cancer.

57. Prior to the pre-termination hearing, Plaintiff had been taking time off of work to go to doctor's appointments.

58. Detention Center was aware that Plaintiff had been taking time off to go see the doctor.

59. As soon as Plaintiff learned that he had cancer he informed Detention Center.

60. Plaintiff provided Major Cheryl Roach with a copy of the CT Abdomen Exam Results, a copy of which is attached hereto as **Exhibit C**.

61. Plaintiff received his Determination Letter, which is attached hereto as **Exhibit D**, on or about December 7, 2005.

62. Plaintiff's surgery to remove the tumor in his kidney was originally scheduled for January 2, 2006.

63. Plaintiff had to reschedule the surgery to January 23, 2006 because Ms. Smith told Plaintiff's doctor's office that he was no longer covered by the County's insurance policy when in fact he was. Please refer to the letter from Doctor Robert Kolosseus' office that is attached hereto as **Exhibit E**.

64. Due to the delay in Plaintiff's surgery, the cancer could have spread.

65. Plaintiff believes that the underlying reasons why he was terminated were because he was formally diagnosed with cancer and neither Detention Center nor the County believed that he would ever fully recover and because he testified on behalf of Sergeant Tellez at his pre-termination hearing.

66. After the surgery, Plaintiff was unable to walk very well, sitting was extremely painful, he could not bend over, he was not allowed to lift anything, and he was ordered by his doctor to take at least six (6) weeks off work to recover from the surgery.

67. Plaintiff would have filed under the Family Medical Leave Act in order to obtain the six (6) week recovery period off of work.

68. For the first three (3) weeks after surgery, Plaintiff could only get out of bed to go to the restroom with the help of his domestic partner, Michelle Armendariz.

69. Plaintiff's domestic partner had to help him shower.

70. Plaintiff could not eat certain foods due to the danger that he may become constipated and would not be able to push in order to relieve himself from being constipated.

71. In the work setting, Plaintiff would not have been able to handle any physical confrontations.

72. In addition, Plaintiff was not able to drive for ten (10) weeks due to the level of pain medications he was taking and due to the fact that he could not sit upright for long periods of time.

73. After the staples were removed from Plaintiff's left side, he was in so much pain and experienced so much tenderness surrounding the location of the surgery that he could not pick up his children, play with his children, lay on his side or on the floor, and he needed help in and out of the car when he had to go to the doctor's office.

74. Plaintiff could not even function well enough to go grocery shopping for his family.

75. Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission, hereinafter "the EEOC," on or about February 16, 2006 which bore EEOC Charge Number 453-2006-00412.

76. Plaintiff received the Right to Sue Letter from the EEOC on or about June 10, 2006.

77. Plaintiff married Michelle Armendariz, his domestic partner, on or about March 10, 2006.

78. When Plaintiff worked for Detention Center he earned $18.17 per hour and worked eighty-four (84) hours every two (2) weeks.

79. Plaintiff is requesting that back wages plus the applicable interest are awarded in this lawsuit.

80. Plaintiff is still unemployed.

81. Plaintiff was required to withdraw his Public Employee Retirement Association, hereinafter "PERA," retirement funds so that he could support himself after he was terminated. Please refer to the Termination Notice form that is attached hereto as **Exhibit F**.

82. At the time that Plaintiff withdrew the PERA funds, he had a balance of $80,000.00 which was reduced to $57,000.00 after he was charged with the penalties for withdrawing the money early.

83. At the time he was terminated, Plaintiff only needed to work approximately five and one half (5 ½) years until he was eligible to retire.

84. Plaintiff estimated that the PERA account would have had a balance of approximately $100,000.00 by the time he retired.

85. Upon retirement, the PERA fund would have been matched dollar for dollar by his employer, so Plaintiff would have retired with $200,000.00.

86. Therefore, Plaintiff is requesting damages for the loss of his retirement funds in the amount of $143,000.00 plus the applicable interest.

87. Plaintiff endured extreme mental distress due to the discrimination he endured based on his disability and the retaliation he was receiving for filing the OSHA complaint and for testifying on behalf of Sergeant Tellez and is requesting both actual and punitive damages on those bases.

## COUNT I—DISCRIMINATION BASED UPON A DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. SECTION 12112(a) (1990)

88. Plaintiff incorporates the preceding paragraphs by reference herein.

89. The Americans with Disabilities Act of 1990, 42 U.S.C. Section 12112 (a) (1990). hereinafter "the ADA," states in pertinent part as follows:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

90. The term "disability" is defined by the ADA in 42 U.S.C. Section 12102(2) (1990) in pertinent part as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment.

91. Pursuant to 42 U.S.C. Section 12102(2)(A) (1990), Plaintiff was disabled because the surgery that was required to remove kidney cancer tumor substantially limited more than one of his major life activities such as Plaintiff was unable to walk very well, sitting was extremely painful, he could not bend over, he was not allowed to lift anything, and he was ordered by his doctor to take at least six (6) weeks off work to recover from the surgery.

92. For the first three (3) weeks after surgery, Plaintiff could only get out of bed to go to the restroom with the help of his domestic partner, Michelle Armendariz.

93. Plaintiff's domestic partner had to help him shower.

94. Plaintiff could not eat certain foods due to the danger that he may become constipated and would not be able to push in order to relieve himself from being constipated.

95. In the work setting, Plaintiff would not have been able to handle any physical confrontations.

96. In addition, Plaintiff was not able to drive for ten (10) weeks due to the level of pain medications he was taking and due to the fact that he could not sit upright for long periods of time.

97. After the staples were removed from Plaintiff's left side, he was in so much pain and experienced so much tenderness surrounding the location of the surgery that he could not pick up his children, play with his children, lay on his side or on the floor, and he needed help in and out of the car when he had to go to the doctor's office.

98. Plaintiff could not even function well enough to go grocery shopping for his family.

99. Pursuant to 42 U.S.C. Section 12102(2)(B) (1990), Defendants had actual knowledge that Plaintiff had kidney cancer because Plaintiff verbally informed Defendants and he gave Major Cheryl Roach a copy of the CT Abdomen Exam Results as soon as it was obtained by Plaintiff.

100. Therefore, Plaintiff qualifies as a disabled person pursuant to either 42 U.S.C. Section 12102(2)(B) or (C) (1990).

101. Plaintiff would have been able to continue with his position as a Sergeant with Detention Center after the six (6) to eight (8) weeks of recovery time after his surgery that was ordered by his doctor.

102. Plaintiff was terminated just prior to when he would have been scheduled to have the kidney tumors removed.

103. Plaintiff believes that he was terminated shortly after Detention Center learned of the kidney cancer because the kidney cancer was essentially the straw that broke the camel's back—first, Plaintiff filed OSHA complaint regarding the bullet proof vests; second, Plaintiff testified on behalf of Sergeant Tellez at his pre-termination hearing; and third, Plaintiff was diagnosed with kidney cancer and may not be able to perform the full duties of his job for at least two (2) months, if not longer.

104. Plaintiff never had the opportunity to request any special accommodations for his disability because he was terminated prior to receiving any treatments for his kidney cancer; however, Defendants would have had no trouble reasonably accommodating Plaintiff without facing undue hardship for the accommodation efforts.

105. Defendants did not have a valid reason to terminate Plaintiff.

106. Therefore, because Defendants knew of Plaintiff's disability and terminated him because of that disability, they have violated the provisions of the ADA, particularly 42 U.S.C Section 12112(a) (1990).

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants under Count I of this Complaint as follows:

a. For past, present and future medical expenses, including therapy and economic losses;

b. For past, present and future pain and suffering;

c. For past, present and future emotional distress and loss of enjoyment of life;

d. For damages to the Plaintiff's reputation; and

e. For lost wages/back pay including interest.

## COUNT II—RETALIATION PURSUANT TO SECTION 503 OF THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. SECTION 12203 (1990)

107. Plaintiff hereby incorporates all preceding paragraphs by reference herein.

108. Section 503 of the Americans with Disabilities Act of 1990, 42 U.S.C. Section 12203
(1990), regarding retaliation claims, provides in pertinent part as follows: "No person shall
discriminate against any individual because such individual has opposed any act or practice
made unlawful by this chapter. . ."

109. On or about November 11, 2003, Plaintiff filed a claim with OSHA regarding the poor
quality of the bullet proof vests that were worn by the transport officers at Detention
Center.

110. Major Chris Barela harassed Plaintiff for contacting Mr. Hernandez about the vests.

111. Plaintiff ordered an ink cartridge for the copy machine in the multi-purpose room of
Detention Center; however, Major Barela told Paula Jurney, the warehouse manager, not to
allow the order because it was for Plaintiff's "personal machine and the County would not
pay for it."

112. Plaintiff confronted Major Barela about refusing the order for the toner and Major Barela
escorted Plaintiff to the office of Detention Center's administrator, Dave Wooly.

113. On or about September 2004, Major Barela transferred Lieutenant Alatorre to Detention
Center's transport division in order to remove all of Plaintiff's authority.

114. At a later date, there was a meeting between Plaintiff, Major Barela, and Ed Fridenstine at
which Major Barela said that his behavior toward Plaintiff would continue.

115. Major Barela's behavior against Plaintiff was allowed to continue with impunity.

116. Plaintiff testified on behalf of Sergeant Tellez on or about September 2005 at his pre-termination hearing.

117. After Plaintiff testified on Sergeant Tellez's behalf, Plaintiff was told by Major Cheryl Roach that he was not allowed to have coffee with Officer Graczyck anymore.

118. The resulting acts of Defendants were unwelcome, constituted retaliation, and were done with the intent to harass Plaintiff because he had filed the OSHA complaint and had testified on behalf of Sergeant Tellez at his pre-termination hearing.

119. The retaliating employees of Detention Center and the County all had positions of authority over Plaintiff.

120. The acts of retaliation were sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and to create a hostile and offensive work environment because Plaintiff was in constant fear of further retaliatory behavior from Defendants and their agents, including termination of employment.

121. Defendants had a duty to protect Plaintiff and other similarly situated employees from retaliation, with such duty arising from, among other things, the employer-employee relationship.

122. The acts of the employees of Defendants could never have occurred without the virtue of their positions.

123. The retaliatory acts of Defendants' employees began immediately after Plaintiff filed the OSHA complaint regarding the bullet proof vests and continued up until the moment Plaintiff's employment with Detention Center was terminated.

124. The County has an express anti-discrimination policy that states in pertinent part as follows:

The County shall not discriminate on the basis of age, color, disability, gender, national origin, race, religion, sexual orientation, veteran status, or any other legally protected

status. This anti-discrimination policy applies to all phases of the employment relationship, and includes a prohibition of retaliation against one who has asserted his rights under this policy. . . . An employee . . . who feels he has been discriminated or retaliated against is encouraged to voice the complaint and to seek guidance from the Human Resources Department relating to complaint procedures available to him.

Please refer to the copy of Section 102 of the Doña Ana County Ordinance No. 187-99

Merit System Ordinance Establishing Human Resources Policies and Procedural

Guidelines, Implementing Human Resources Policies, hereinafter "the Employee

Handbook," which is attached hereto as **Exhibit G**.

125. Despite the policy against retaliation expressed in Section 102 of the Employee Handbook, Defendants tolerated a pattern of retaliation and has failed to train, investigate and take prompt remedial action with respect to various incidents of retaliation, including the type described herein by Plaintiff.

126. Plaintiff attempted on numerous occasions to report to the County's Human Resources Department the acts of retaliation that he had been experiencing for the past couple of years without any success.

127. Defendants' deliberate indifference and/or gross negligence created a climate in which employees of Defendant SPRC could ridicule, insult, and humiliate other fellow employees with impunity.

128. Defendants' unconscious failure to protect the Plaintiff from such abusive conditions created by fellow workers amounted to intentional retaliation.

129. Defendants failed to act to prevent Defendants' employees from retaliating against Plaintiff.

130. Such failure to act was a substantial factor leading to, and/or the proximate cause of, Plaintiff's injuries.

131. Defendants, pursuant to the Doctrine of Respondeat Superior, are vicariously liable for any acts and omissions of their employees committed within the scope of their employment.

132. Plaintiff's employment at Detention Center was terminated because Plaintiff exercised his rights to file an OSHA complaint and testified on behalf of a co-worker who was being accused of kicking an inmate at Detention Center, and because Plaintiff reported to his supervisors that he had kidney cancer less than a month prior to his termination.

133. Therefore, there is a causal connection between Plaintiff filing the OSHA complaint, testifying at Sergeant Tellez's pre-termination hearing, and informing his employers of his kidney cancer and his resulting termination.

134. Furthermore, approximately three (3) months after Plaintiff testified on behalf of Sergeant Tellez at his pre-termination hearing, his employment at Detention Center was terminated.

135. Plaintiff feels extremely angry and betrayed as a result of the incidents described herein.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants under Count II of this Complaint as follows:

a. For past, present and future medical expense, including counseling/therapy and economic losses;

b. For past, present, and future pain and suffering;

c. For past, present and future emotional distress and loss of enjoyment of life;

d. For damages to Plaintiff's reputation;

e. For lost wages/back pay;

f. For attorney's fees, taxes and costs in bringing this suit, including expert fees; and

g. For such further relief as the Court deems just and proper.

## COUNT III—VIOLATION OF PROCEDURAL DUE PROCESS

136. Plaintiff incorporates the preceding paragraphs by reference herein, and states that Count III is directed to all Defendants.

137. Defendants violated the procedural Due Process Clause of the Fourteenth Amendment to the United States Constitution.

138. Procedural Due Process ensures that a Plaintiff is not deprived of life, liberty, or property without fair deprivation procedures first being employed.

139. Plaintiff had a property interest in his continued employment at Detention Center that was created by his reliance on the expansive terms of the Employee Handbook and due to the fact that he had been employed by Detention Center for the past eighteen and one half (18 ½) years.

140. Based on the fact that Plaintiff had a property interest in his continued employment at Detention Center, he was entitled to both notice of hearing and an opportunity to be heard.

141. Plaintiff does not dispute that he received adequate notice of his pre-termination hearing; however, he asserts that he did not receive an adequate opportunity to be heard at his pre-termination hearing.

142. Plaintiff filled out all of the required insurance paperwork as he had been instructed to do by the lady at the insurance orientation after he had explained to her the situation with his domestic partner and then submitted it to Janeen Smith at the County Human Resources Department at which time Ms. Smith stated "if there is anything wrong or we need any additional information, we will contact you."

143. Plaintiff never heard another word about the insurance application until he was given the Notice of Intent to Terminate Employment dated October 14, 2005.

144. Plaintiff was not given the opportunity to correct or modify his insurance application as promised by Ms. Smith.

145. Plaintiff never would have included his domestic partner on his insurance application had he known that he would could potentially be terminated as a result.

146. In addition. Detention Center never followed the progressive discipline procedures that are outlined in the County's Progressive Procedures manual. Plaintiff was just immediately thrown into the termination process.  Please refer to the document attached hereto as **Exhibit H**, which is a copy of the first page out of the County's Progressive Procedures manual entitled "The Fundamental Elements of Progressive Discipline."

148. Particularly, Detention Center did not make any attempt to follow Rule 3 listed on **Exhibit H** which states "The employee needs to have a reasonable period of time in which to fix the problem."

149. Plaintiff simply received the Notice of Intent to Terminate Employment and was never given an opportunity to remedy the situation.

150. Five (5) other employees were accused of insurance fraud; however, upon information and belief, only Plaintiff was terminated.

151. On or about November 15, 2005, Plaintiff had his pre-termination hearing at which Sue Padilla, the Hearing Officer. Jim Caldwell, the County's Attorney, Arturo Rodriguez, the County's Personnel Director, Vicki Lusk, the County's Personnel Officer, and Plaintiff's domestic partner, Michelle Armendariz, were present.

152. Plaintiff had requested, prior to the pre-termination hearing, that Major Cheryl Roach and that County Manager Brian Haines be present at the hearing as witnesses for Plaintiff.

153. Jim Caldwell would not produce the County Manager and stated that there was nothing that Plaintiff could ask him that would be of any relevance to the proceedings even though Jim Caldwell was not even aware of the questions that Plaintiff intended to ask the County Manager.

154. At the pre-termination hearing, questions were asked of Plaintiff; however, he was never given the opportunity to present his own case, he was just allowed to answer the questions that were asked.

155. Plaintiff attempted to give the Hearing Officer a copy of his Final Divorce Decree; however, Ms. Padilla stated that Plaintiff should have given that to the County at an earlier date and refused to enter the document into evidence.

156. At the conclusion of the hearing, Plaintiff asked for a copy of the tape of the hearing and a copy of the findings that Ms. Padilla would present to the County Manager prior to his final determination.

157. Jim Caldwell stated that Plaintiff was not entitled to a copy of either of the requested items.

158. Plaintiff's property interest in his employment position at Detention Center was violated because he was terminated without an adequate opportunity to be heard; therefore, Plaintiff's procedural Due Process rights that are guaranteed by the Fourteenth Amendment to the United States Constitution were violated.

    **WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants under Count III of the Complaint as follows:

a.  For past, present and future medical expenses, including therapy and economic losses;

b.  For past, present and future pain and suffering;

c.  For past, present and future emotional distress and loss of enjoyment of life;

d.  For damages to the Plaintiff's reputation; and

e.  For lost wages/back pay.

## COUNT IV—VIOLATION OF SUBSTANTIVE DUE PROCESS

159. Plaintiff incorporates the preceding paragraphs by reference herein, and states that Count IV is directed to all Defendants.

160. Count IV is asserted as an alternative to the remedies requested in Count III of this Complaint should the Court decide that Plaintiff's procedural Due Process rights were not violated by Defendants.

161. Defendants violated the substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution.

162. Substantive Due Process ensures that a Plaintiff is not deprived of life, liberty, or property for an arbitrary reason even though Plaintiff may have received fair procedural Due Process procedures.

163. Plaintiff had a property interest in his continued employment at Detention Center that was created by his reliance on the expansive terms of the Employee Handbook and due to the fact that he had been employed by Detention Center for the past eighteen and one half (18 ½) years.

164. Based on the fact that Plaintiff had a property interest in his continued employment at Detention Center, he was entitled to both notice of hearing and an opportunity to be heard.

165. Plaintiff was not allowed to submit a copy of his Final Divorce Decree at his pre-termination hearing which demonstrated that his divorce was final as of October 2005 and that he did have a right to claim his domestic partner as a covered individual on his insurance application.

166. Plaintiff was never presented with the opportunity to amend his insurance application to omit his domestic partner as a covered individual under his insurance policy.

167. Plaintiff filled out all of the required insurance paperwork in good faith as he had been instructed to do so by the lady at the insurance orientation after he had explained to her the situation with his domestic partner.

168. Plaintiff had absolutely no intention of committing any sort of fraud upon the insurance company, the State of New Mexico, or the County.

169. When Plaintiff submitted his insurance application to Janeen Smith at the County Human Resource Department, Ms. Smith stated "if there is anything wrong or we need any additional information, we will contact you."

170. Plaintiff was never contacted.

171. Therefore, Plaintiff's substantive Due Process rights were violated because Defendants arbitrarily terminated his employment without allowing Plaintiff to correct the errors he had made on his application for insurance and by accusing him of fraud without Plaintiff having any underlying intent to commit fraud upon the insurance company, the State, or the County.

      **WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants under Count IV of the Complaint as follows:

a. For past, present and future medical expenses, including therapy and economic losses;

b. For past, present and future pain and suffering;

c. For past, present and future emotional distress and loss of enjoyment of life:

d. For damages to the Plaintiff's reputation: and

e. For lost wages/back pay.

## COUNT V—TORTUOUS INTERFERENCE WITH AN EMPLOYMENT RELATIONSHIP

172. Plaintiff incorporates all preceding paragraphs by reference herein and states that Count V is directed to all Defendants.

173. In *Kelly v. St. Vincent Hospital,* 102 N.M. 201, 207, 692 P.2d 1350, 1356 (Ct. App. 1984) citing *M&M Rental Tools, Inc. v. Milchem, Inc.,* 94 N.M. 449, 612 P.2d 241 (Ct. App. 1980), the New Mexico Court of Appeals stated "Tortuous interference can be

accomplished by two means: by improper motive solely to harm the plaintiff, or by improper means."

174. In the matter at hand there were both improper motive solely to harm Plaintiff and improper means employed by Defendants.

175. Plaintiff had an employment relationship with Detention Center which was terminated seemingly because Plaintiff informed his superiors that he had kidney cancer in combination with the facts that Plaintiff had already filed an OSHA complaint against Detention Center and had testified at a pre-termination hearing on behalf of Sergeant Tellez.

176. Hence, Defendants had improper and unlawful motives for terminating Plaintiff's employment at Detention Center.

177. Plaintiff was also falsely accused of committing insurance fraud which was undoubtedly done in an attempt to come up with seemingly valid reason to terminate Plaintiff's employment with Detention Center without directly addressing his kidney cancer, the fact that Plaintiff had filed a Complaint with OSHA against Detention Center, and the fact that Plaintiff had testified on behalf of Sergeant Tellez at his pre-termination hearing.

178. Hence, Defendants utilized improper means to terminate Plaintiff's employment at Detention Center.

179. Therefore, Plaintiff has met his burden in demonstrating that Defendants committed tortuous interference with an employment relationship.

180. In addition, Plaintiff had a good employment position with Detention Center and would have ultimately retired as a Sergeant from Detention Center, and would have collected his full retirement benefits, had Defendants not interfered with his potential.

181. But for the acts and omissions of Defendants Plaintiff would still be employed at Detention Center.

182. Thus, the acts and omissions of Defendants described above in this Complaint constituted interference with an employment relationship.

**WHEREFORE,** Plaintiff requests the Court enter judgment against Defendants under Count V of this Complaint as follows:

a. For past, present and future related medical expense and economic losses;

b. For past, present, and future pain and suffering;

c. For past, present and future emotional distress and loss of enjoyment of life;

d. For lost back wages;

e. For damages to Plaintiff's career potential;

f. For attorney's fees, taxes and costs in bringing this suit, including expert fees; and

g. For such further relief as the Court deems just and proper.

## COUNT VI—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

183. Plaintiff incorporates the preceding paragraphs by reference herein and states that Count VI is directed to all Defendants.

184. There are three elements for an intentional infliction of emotional distress claim:  (1) the conduct of defendant was extreme and outrageous under the circumstances; (2) the defendant acted intentionally or recklessly; and (3) as a result of the conduct of the defendant, plaintiff experienced severe emotional distress.  Furthermore,

> Extreme and outrageous conduct is that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person. Emotional distress is "severe" if it is of such an intensity and duration that no ordinary person would be expected to tolerate it.

NM UJI 13-1628.

185. Pursuant to the first element of NM UJI 03-1628, the conduct of Defendants was extreme and outrageous under the circumstances for several reasons.

186. Major Barela harassed Plaintiff for complaining OSHA about the inadequacy of the bullet proof vests utilized by the officers who worked for the transport division of Detention Center.

187. Plaintiff ordered an ink cartridge for the copy machine in the multi-purpose room of Detention Center; however, Major Barela told the warehouse manager not to allow the order because it was for Plaintiff's "personal machine and the County would not pay for it."

188. On or about September 2004, Major Barela transferred Lieutenant Alatorre to Detention Center's transport division in order to remove all of Plaintiff's authority.

189. Plaintiff had several meetings with Detention Center management in which he reported the harassment he experienced from Major Barela as a result of having filed the complaint with OSHA; however, the harassment was allowed to continue following those meetings.

190. Major Barela even admitted in front of Mr. Fridenstine that the harassment Plaintiff had experienced thus far would continue.

191. Plaintiff experienced continuous harassment and retaliation for looking out for his fellow officers in the transport division of Detention Center including verbal harassment as well as loss of respect and authority.

192. When Plaintiff testified on behalf of Sergeant Tellez at his pre-termination hearing, he was further harassed and retaliated against.

193. All the continuous harassment and retaliation described above was extreme and outrageous because Plaintiff was merely exercising rights that he has pursuant to OSHA regulations.

the Employee Handbook, and United States federal law, and Defendants and their agents were allowed to harass and retaliate against Plaintiff with impunity anyway.

194. The acts which have been described above clearly go beyond the bounds of common decency and are atrocious and intolerable to the ordinary person.

195. Regarding the second element of NM UJI 13-1628, Defendants acted intentionally, through the Doctrine of Respondeat Superior, by allowing the harassment and retaliatory acts of their agent, Major Barela, toward Plaintiff to continue even after Plaintiff brought the retaliatory actions of Major Barela to Defendants' attention.

196. At the very least, Defendants acted atrociously for allowing Major Barela to do such things with impunity.

197. In regards to the third element of NM UJI 13-1628, no ordinary person would be expected to tolerate the acts described above due to the intensity and duration of the acts.

198. Plaintiff went to work everyday for two (2) years believing that Defendants were actively looking for reasons to terminate him.

199. Plaintiff has endured ridicule, harassing statements, and other retaliatory measures concerning the complaint he filed with OSHA regarding the inadequacy of the bullet proof vests and concerning the fact that he testified in Sergeant Tellez's behalf at his pre-termination hearing.

200. The aforementioned facts, in addition to the fact that Plaintiff was experiencing severe emotional distress as a result of his recent diagnosis of kidney cancer, were far too extreme for Plaintiff to bear.

201. Plaintiff received his Determination Letter on or about December 7, 2005.

202. Plaintiff's surgery to remove the tumor in his kidney had been originally scheduled for January 2, 2006.

203. Plaintiff had to reschedule the surgery to January 23, 2006 because Ms. Smith told Plaintiff's doctor's office that he was no longer covered by the County's insurance policy when in fact he was.

204. Due to the delay in Plaintiff's surgery, the cancer could have spread.

205. Plaintiff believes that the underlying reasons why he was terminated were because he was formally diagnosed with cancer and neither Detention Center nor the County believed that he would ever fully recover and because he testified on behalf of Sergeant Tellez at his pre-termination hearing.

206. After the surgery, Plaintiff was unable to walk very well, sitting was extremely painful, he could not bend over, he was not allowed to lift anything, and he was ordered by his doctor to take at least six (6) weeks off work to recover from the surgery.

207. Plaintiff was further distressed by the fact that if he lost his job he would have an extremely difficult, if not impossible, time finding a replacement medical insurance provider due to his life-threatening medical conditions.

208. Plaintiff utilized the services of Chaplin David Beam, Detention Center's Chaplin, in place of seeking a counselor to help him get through all the emotional trauma he had been suffering while he was a Detention Center employee.

209. Hence, Plaintiff has met his burden in demonstrating that Defendants, particularly through and by their agent Major Barela, have intentionally inflicted emotional distress upon Plaintiff.

210. The statements describe above have caused further retaliation and financial losses to Plaintiff and the entire situation has made Plaintiff extremely upset for the past couple of years.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter a judgment against

Defendants on Count VI as follows:

a. For past, present and future medical expenses;

b. For past, present and future pain and suffering;

c. For exemplary and punitive damages;

d. For attorney's fees, taxes and costs in bringing all counts; and

e. For such relief as the Court deems just and proper.

Respectfully submitted by:

Isabel Jerabek
Attorney for Plaintiff
1850 North Solano Drive
Las Cruces, NM 88001
Phone: (505) 524-1331
Fax: (505) 647-3778

THIS PLEADING IS TOO VOLUMINOUS

TO SCAN.  THE ORIGINAL IS IN THE

CASE FILE LOCATED IN THE RECORDS

DEPARTMENT, U.S. DISTRICT COURT

CLERK'S OFFICE.