## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**EDWIN CHAVEZ, JR.,**

      **Plaintiff,**

**vs.**                                        **No. CIV 06-0818 DJS/LAM**

**DOÑA ANA COUNTY DETENTION
CENTER, as an agent of DOÑA ANA
COUNTY COMMISSIONERS, AND
JOHN DOES I-V,**

      **Defendants.**

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment
**[Doc. 23]**, filed March 22, 2007.  Having reviewed the motion, the memoranda in support and in
opposition, the applicable law, and being otherwise fully informed, the Court finds that the motion
should be granted in part and denied in part.

### I.  Standard of Review

The Court will grant summary judgment when there is no genuine issue as to any material
fact, and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The movant
carries the burden of establishing there are no genuine issues of material fact, *Adickes v. S. H.
Kress & Co.*, 398 U.S. 144, 157 (1970), but may discharge its burden by showing there is an
absence of evidence to support the non-movant's case, *Celotex Corp. v. Catrett*, 477 U.S. 317,
325 (1986).  Once the movant meets its burden, the burden shifts to the non-movant to
demonstrate a genuine issue for trial on a material matter.  *Bacchus Indus., Inc. v. Arvin Indus.,
Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  In making its summary judgment determination, the

court looks at the pleadings and documentary evidence in the light most favorable to the non-movant, *Deepwater Invs., v. Jackson Hole Ski Corp.* 938 F.2d 1105, 1110 (10th Cir. 1991), and the movant must show beyond a reasonable doubt it is entitled to summary judgment, *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir. 1991).  However, once the burden shifts to the non-movant, that party may not rest on its pleadings but must set forth specific facts showing there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex Corp.*, 477 U.S. at 324.  However, "the mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  If the non-movant cannot make such a showing, after adequate time for discovery, summary judgment is mandated.  *Celotex Corp.*, 477 U.S. at 322. The Court will consider Defendants' motion for summary judgment in light of these standards.

## II.  Factual Background

Plaintiff is an Hispanic male and is fifty (50) years old.  Compl. ¶1.  Plaintiff had been employed by Defendants since May 21, 1986.  *Id.* ¶6.  Initially, Plaintiff served as a Detention Officer for Doña Ana County Detention Center (Detention Center); two years after Plaintiff was hired he was promoted to Sergeant.  *Id.* ¶13.  On or about **November 11, 2003**, Plaintiff complained to Herman Hernandez at OSHA regarding the inadequacy of the bullet proof vests provided to the Detention Center's transport officers.  *Id.* ¶14.  Major Chris Barela harassed Plaintiff for contacting Mr. Hernandez regarding the bullet proof vests.  *Id.* ¶16.  On or about August 2004, nine months after this complaint to OSHA, new bullet proof vests were delivered to the Detention Center.  *Id.* ¶15.

2

Thereafter, Plaintiff ordered an ink cartridge for the copy machine in the multi-purpose room of the Detention Center. *Id.* ¶17. Major Barela directed the warehouse manager not to approve the order, claiming it was Plaintiff's "personal machine and the County would not pay for it." *Id.* Plaintiff confronted Major Barela. Major Barela escorted Plaintiff to the office of Dave Wooly, the Detention Center Administrator. *Id.* ¶18. When Major Barela left Mr. Wooly's office, Plaintiff had the opportunity to complain to Mr. Wooly about Major Barela's retaliation against Plaintiff. *Id.* ¶20. Mr. Wooley requested two weeks to resolve Plaintiff's concerns with Major Barela. *Id.* ¶21. However, Mr. Wooley did nothing to resolve Plaintiff's concerns regarding Major Barela's retaliation against him.

At another meeting between Plaintiff, Major Barela, and Ed Fridenstine, Major Barela stated his behavior toward Plaintiff would continue. *Id.* ¶23. Additionally, Major Barela and Mr. Fridenstine informed Plaintiff they did not believe Plaintiff had a case for retaliation. *Id.*¶24. Plaintiff outlined his concerns regarding Major Barela in a letter to Herman Hernandez at OSHA. *Id.* ¶25; Ex. A. Mr. Hernandez never responded to Plaintiff's letter. *Id.* ¶26.

On or about **June 6, 2005**, Plaintiff submitted to Defendants a physician's note regarding Plaintiff's need for boots with padded insoles. *Id.*¶27. Plaintiff made several inquiries regarding the requested work boots, however, as of July 19, 2005, he had not received the boots. *Id.* ¶28.

On or about **August 11, 2005**, Sergeant Todd Tellez was accused of kicking a restrained inmate. *Id.* ¶29. At Sergeant Tellez' request, Plaintiff testified on his behalf at Sergeant Tellez' pretermination hearing. *Id.* ¶30. After Plaintiff testified at Sergeant Tellez' pretermination hearing, Major Cheryl Roach informed Plaintiff he was not allowed to have coffee with Officer Graczyck anymore. *Id.* ¶31. Major Roach did not restrict Sergeant Tellez and Lieutenant Charlie

3

Mashburn in the same fashion. *Id.* ¶32. At this point, Plaintiff begin to sense Defendants were retaliating against him for testifying on Sergeant Tellez' behalf and were looking for a reason to terminate his employment. *Id.* ¶¶33, 34.

On or about the last week of **September 2005**, employees at the Detention Center were required to attend an orientation for their employer's new group health insurance plans. *Id.* ¶35. All employees had a week to enroll if they wanted coverage under the new group health insurance plan. *Id.* Otherwise, an employee would have to wait for one year before the employee would have the opportunity to enroll. *Id.* ¶36. Completed insurance forms were collected at this orientation. *Id.* ¶37.

For the first time, the new group health insurance plans were extending benefits to domestic partners. At this time, Plaintiff had been legally separated from his wife since 2003. *Id.* ¶39. However, Plaintiff's divorce was to be final in two weeks. *Id.* ¶38. Additionally, Plaintiff had been living with his domestic partner and her children since July 17, 2004. *Id.* ¶40. Plaintiff and his domestic partner shared personal finances, utility bills, cellular telephone bills, and rental obligations. *Id.* Because of these circumstance, Plaintiff explained his living situation and pending divorce to the individual who conducted the orientation. *Id.* ¶41. The individual advised Plaintiff to include his domestic partner and her children in his insurance enrollment forms and assured him this would not be a problem. *Id.* Accordingly, Plaintiff completed the required insurance enrollment forms and submitted the paperwork to Jeanine Smith, the appropriate County employee who informed him she would contact Plaintiff if "there was anything wrong or additional information was needed." *Id.* ¶42.

Plaintiff never heard from Ms. Smith or her department regarding the insurance enrollment form. *Id.* ¶43.  However, on **October 14, 2005**, Plaintiff received a Notice of Intent to Terminate. *Id.* ¶43.  In this notice, Arturo A. Rodriguez, the Human Resources Director for the County of Doña Ana, informed Plaintiff he was recommending termination of Plaintiff's employment "based on violations of the Insurance Fraud Act."  Compl. Ex. B.  Mr. Rodriguez claimed Plaintiff had given false information in his application for insurance when he listed his domestic partner while still married to his now former spouse. *Id.*

Plaintiff contends he was never given the opportunity to correct his insurance application even though Ms. Smith had assured him he would be notified if "there was anything wrong." *Id.* ¶44.  Additionally, Plaintiff contends the Detention Center never followed the progressive discipline procedures outlined in Doña Ana County's Progressive manual. *Id.* ¶45.  Plaintiff also alleges he was treated differently than five (5) other employees who also were accused of insurance fraud.  Plaintiff was the only employee terminated. *Id.* ¶46.

On **November 15, 2005**, Plaintiff had a pretermination hearing. *Id.* ¶48.  The following individuals attended the pretermination hearing: (1) Plaintiff; (2) Sue Padilla, hearing officer; (3) Jim Caldwell, County Attorney; (4) Arturo Rodriguez, Personnel Director; (5) Vicki Lusk, Personnel Officer; and (6) Michelle Armendariz, Plaintiff's domestic partner. *Id.*  Prior to the pretermination hearing, Plaintiff requested that Major Cheryl Roach and County Manager Brian Haines be present at the hearing as witnesses for Plaintiff. *Id.* ¶49.  Mr. Caldwell opined Manager Haines had nothing relevant to add to the proceeding. *Id.* ¶50.  Thus, Manager Haines did not appear at Plaintiff's pretermination hearing.  Moreover, Plaintiff contends he was never given the opportunity to present his case and was only allowed to answer the questions he was asked. *Id.*

¶52. Additionally, the hearing officer would not allow Plaintiff to enter his Final Divorce Decree into evidence. *Id.* ¶53. At the conclusion of his pretermination hearing, Plaintiff requested a copy of the tape of the hearing and a copy of the findings the hearing officer would present to the County Manager prior to his final determination. *Id.* ¶54. Mr. Caldwell informed Plaintiff he was not entitled to the tape or the hearing officer's findings. *Id.* ¶55.

Prior to the pretermination hearing, the Detention Center was aware that Plaintiff had been taking time off from work to go to his physician's appointments. On **November 16, 2005**, <u>one day after Plaintiff's pretermination hearing</u>, a CT scan of the abdomen and pelvis revealed a "solid mass in the [Plaintiff's] left kidney mid to upper pole measuring 4.3 x 3.6 x 3.5 cm suspicious for renal cell carcinoma." *Id.*, Ex. C. As soon as Plaintiff was diagnosed with renal cell carcinoma, he informed the Detention Center of his diagnosis and provided Major Cheryl Roach with a copy of the CT scan results. On **December 7, 2005**, Plaintiff received his Determination Letter. *Id.*, Ex. D. Plaintiff contends Defendants terminated him due to his kidney cancer diagnosis. *Id.* ¶65.

### III.  Discussion

As a preliminary matter, the Court notes Plaintiff concurs with Defendants regarding the dismissal of his substantive due process claim. *See* Pl.'s Resp. to Defs.' Mot. for S.J. at unnumbered pg. 15. Plaintiff concedes he cannot meet "the standard [ ] required to prove a substantive due process claim." *Id.* Accordingly, the Court will dismiss Plaintiff's substantive due process claim.

**A.  Procedural Due Process Claim**

In Plaintiff's response, Plaintiff's counsel states, "Plaintiff has not named any individual persons in his lawsuit.  Therefore, he concurs that his 42 U.S.C. §1983 civil rights claim against Defendants should be dismissed at this time." *Id.* at unnumbered pg. 14.  Plaintiff's counsel then proceeds to set forth an argument in support of Plaintiff's claim that Defendant Doña Ana County deprived him of his property interest in continued employment in violation of the Due Process Clause of the Fourteenth Amendment. The Court presumes that Plaintiff's counsel understands that a due process violation is brought pursuant to §1983 and thus did not intend to dismiss this claim.  Accordingly, the Court will address Plaintiff's due process claim.

The Fourteenth Amendment protects citizens from the deprivation of "life, liberty, or property, without due process of law."  Const. amend. XIV, § 1.  "[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision." *Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 490 (10th Cir.1991).   "To determine whether a plaintiff was denied procedural due process, [the Court] engages in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir.1998). Defendants do not dispute that Plaintiff possessed a protected interest in his employment.  Thus, the only issue is whether Defendants afforded Plaintiff an appropriate level of process.

The Due Process Clause requires that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quotation omitted).  However, a pretermination hearing "need not be

elaborate" nor does it need to be a full-blown evidentiary hearing.  *Id.*  Moreover, "the pretermination hearing need not definitively resolve the propriety of the discharge."  *Id.*  Under *Loudermill,* "the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  *Id.*

Plaintiff concedes that Defendants afforded him a pretermination hearing, i.e., he was given written notice of the charges against him (Defs.' Ex. A to Ex. 1– Notice of Intent to Terminate Employment), the Human Resources Director for Doña Ana County presented the evidence against Plaintiff at the pretermination hearing (Defs.' Ex. D to Ex. 1– Transcript of Pretermination Hearing), and a review of the transcript indicates Defendants gave Plaintiff the opportunity to present his side of the story.  Plaintiff also had the opportunity to present witnesses on his behalf.  In fact, Plaintiff's witness appeared at the hearing, yet he declined to ask the witness any questions.  Nonetheless, Plaintiff contends he was not allowed to bring up "any other issues he had with Doña Ana County, such as his ADA (Americans with Disabilities Act) claims and his retaliation claims."  Pl.'s Resp. to Defs.' Mot. for S.J. at unnumbered pg. 14.

The transcript of the pretermination hearing belies this contention.  At the conclusion of the hearing, the Hearing Officer addressed Plaintiff and asked, "Mr. Chavez, do you have any other comments you would like to — make for the record?"  Defs.' Mem. in Support of Mot. for S.J.; Ex. D to Ex. 1, pg 50, lines 7-10.  At this point, Plaintiff had the opportunity to raise any issues he wished to bring before the Hearing Officer.  Later in the hearing, the Hearing Officer also asked the following question, "Does either side have any other comments?"  *Id.*, pg 51, lines 24-25.  Again, Plaintiff did not raise any issue regarding a disability claim or retaliation claim.

8

The Court finds that Plaintiff's claim that Defendants did not allow him to raise any other issues at his pretermination hearing is not supported by the evidence.  The Court further finds that Plaintiff received an adequate pretermination hearing.

Additionally, in a letter dated **December 7, 2005**, the County Manager informed Plaintiff that "the Hearing Officer recommended termination of [Plaintiff's] employment" and that the County Manager concurred with the recommendation.  *Id.*; Ex. C to Ex. 1 (Determination Letter from Mr. Haines).  The County Manager also informed Plaintiff that his employment with Doña Ana County had been terminated effective December 9, 2005.  *Id.*  Citing to Doña Ana County Ordinance No. 187-99 and Human Resource Policy No. 1006, the County Manager further informed  Plaintiff of his right to appeal the County Manager's decision through the process of arbitration.  *Id.*  Although Plaintiff did not take advantage of the arbitration process, nonetheless, had he proceeded to arbitration he could have raised the issue(s) regarding his ADA and retaliation claims.

Finally, the parties do not provide any information from which the Court can determine whether the arbitration process was required by a collective bargaining agreement which would have satisfied Plaintiff's entitlement to a post-termination hearing .  *See Hennigh,* 155 F.3d at 1256 (grievance procedures provided by a collective bargaining agreement can satisfy a plaintiff's entitlement to post-deprivation due process).  Notwithstanding, Plaintiff does not allege he requested a post-termination hearing thus he has waived any challenge to Defendant Doña Ana County's post-termination hearing procedures.  *See Lee v. Regents of Univ. of California*, 221 Fed.Appx. 711, 713 (10th Cir. Feb. 23, 2007)(unpublished).  Accordingly, the Court finds that

Plaintiff was accorded adequate process.  Defendants' motion for summary judgment as to this claim is granted.

## B.  Americans with Disabilities Act (ADA) Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C.  §12112(a).  A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C.  §12111(8).  "To establish a prima facie case under the ADA, plaintiff must demonstrate (1) that he is disabled within the  meaning of the ADA;  (2) that he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) that his employer terminated his employment under circumstances that give rise to an inference that termination was based on his disability."  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997).  In this case, there is no dispute that Plaintiff was able to perform the essential functions of the job, with or without reasonable accommodation.  Thus, the Court need only address the first and third prong.

Because Plaintiff does not rely on any direct evidence of discrimination, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), governs the analysis of his claims.  *Id.* at 1323 & n.3 (applying *McDonnell Douglas* in ADA context).  Thus, on summary judgment, "a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case."  *Id.*  If a plaintiff establishes a prima facie

case, the burden shifts to the defendant "to offer a legitimate nondiscriminatory reason for its employment decision." *Id.* If the defendant comes forward with such a reason, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual– i.e., unworthy of belief." *Id.* (internal quotations omitted). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 1323 (internal citations omitted).

Defendants dispute Plaintiff is disabled within the meaning of the ADA. Defendants contend "surgical procedures, recovery time and resulting illnesses do not necessarily constitute a disability." Defs.' Mem. in Support of Mot. for S.J. at 7. Defendants rely on Plaintiff's **February 27, 2007** deposition testimony that he had recovered from his surgery to support their contention that Plaintiff was not disabled within the meaning of the ADA.

A "disability" is defined by the ADA as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(2); *see also Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478 (1999). The regulations implementing the ADA define the term "substantially limits" as: (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life

11

activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.  29 C.F.R. §1630.2(j)(1).

Several factors are relevant to the determination of whether an impairment is substantially limiting, including: "(i) The nature and severity of the impairment;  (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. §1630.2(j)(2). Whether an impairment "substantially limits" a major life activity depends on the individual and the impairment.  Such determinations are not susceptible to per se rules; they "must be made on a case-by-case basis."  *See* 29 C.F.R. pt. 1630 app., §1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."); *see also Bragdon v. Abbott*, 524 U.S. 624, 641-642 (1998)("[W]hether a person has a disability under the ADA is an individualized inquiry.").  The regulations and the EEOC's interpretive guidelines clearly state that an impairment need not be permanent in order to rise to the level of a disability. See 29 C.F.R. §1630.2(j)(2)(iii).

Finally, the term "major life activities," as used in the ADA, "refers to those activities that are of central importance to daily life."  *Toyota Motor Mfg, Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002).  "Major life activities," as defined in the regulations implementing the ADA encompasses "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. §1630.2(i).

"Whether the plaintiff has an impairment within the ADA is a question of law for the court to decide."  *Doebele v. Sprint*, 342 F.3d 1117, 1129 (10th Cir. 2003).  "Whether the conduct

affected is a major life activity for purposes of the Act is also a legal question for the court." *Id.* "However, ascertaining whether the impairment substantially limits the major life activity is a factual question for the jury." *Id.*

In his Complaint, Plaintiff avers "that the underlying reasons why he was terminated were because he was formally diagnosed with cancer and neither [the] Detention Center nor the County believed he would ever fully recover . . . ." Compl. ¶65. This allegation falls under the "regarded as" provision of the ADA. Under this provision, "[e]ven if an impairment does not substantially limit a major life activity, a plaintiff is still covered by the ADA's protections if an employer regarded him or her as having an impairment that substantially limits a major life activity." *Murphy v. United Parcel Service*, 141 F.3d 1185 (10th Cir. 1998)(unpublished)(citing 42 U.S.C. §12102(2)(C)).

In *Sutton*, the Supreme Court noted:

Under subsection (C), individuals who are "regarded as" having a disability are disabled within the meaning of the ADA. §12102(2)(C). Subsection (C) provides that having a disability includes "being regarded as having," §2102(2)(C), a physical or mental impairment that substantially limits one or more of the major life activities of such individual," §2102(2)(A). There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases it is necessary that a covered entity entertain misperceptions about the individual– it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of . . . individual ability."

*Sutton*, 527 U.S. at 489.

Here Plaintiff asserts Defendants mistakenly believed Plaintiff's cancer substantially limited his ability to do any work.[1] Compl. ¶65, ¶100. When a major life activity at issue is that of working, a plaintiff must show that he is unable to perform either a class of jobs or a broad range of jobs in various classes. *Sutton*, 527 U.S. at 491-92. Therefore, a plaintiff asserting he is disabled under the "regarded as" definition of disability must show that his employer regarded him as having an impairment substantially limiting his ability to perform a broad range of jobs, rather than a single position, and that the employer's misperception was "based on 'myth, fear, or stereotype,' including concerns regarding safety, insurance, liability, and acceptance by coworkers and the public. *See McKenzie v. Dovala*, 242 F.3d 967, 971 (10th Cir. 2001).

In support of his contention that Defendants mistakenly believed Plaintiff's kidney cancer substantially limited his ability to do any work, Plaintiff presented the following evidence; (1) he had been employed at the Detention Center since 1986; (2) Defendants failed to follow their own policy when they failed to apply their progressive disciplinary procedures in his case; (3) five other employees also were accused of insurance fraud, yet he was the only one terminated; and (4) Doña Ana County terminated Plaintiff on **December 9, 2005**, shortly before he was scheduled to have surgery to remove the renal cell carcinoma and then misinformed Plaintiff's physician that Plaintiff was no longer covered by the county's insurance policy effective **December 10, 2005**, thus delaying his surgery for three weeks exposing him to an increased risk of having the cancer metastasize (Compl. ¶63, ¶64, ¶102, ¶103 and Ex. E to Compl).

---

[1] Plaintiff also asserted in his Complaint that his cancer constituted an actual impairment that substantially limited one or more of his major life activities such as walking, sleeping, eating, lifting, etc. Compl. ¶91-99.

14

Defendants presented evidence showing the hearing officer heard five cases, including

Plaintiff's case, which involved falsification of data on health insurance application forms.  Defs.'

Mem. in Support of Mot. for S.J.; Ex.1 (Padilla Aff.).  The hearing officer attested, in pertinent

part, as follows:

> 9.  Hearings were conducted by Doña Ana County on five cases involving allegations of falsification of data on health insurance application forms.  Health insurance applications were required of employees after Doña Ana County decided to change its health insurance carrier from one company to another.

> 10.  Of the five cases I heard as a hearing officer, two of the individuals provided documentation showing they were legally married and, thus, were in compliance with the requirements set out in the application forms for the new health insurance coverage being provided by Doña Ana County.  In two of the other cases [in] which I was a hearing officer, I made the determination that due to the language barriers the applicants did not understand the requirements and they assumed they were married under the provisions of common law.  These employees were suspended without pay.  They also made restitution to Doña Ana County and were allowed to maintain their jobs.

> 11.  The fifth case involving Plaintiff Edward Chavez, Jr. had circumstances and situations which were different.  Plaintiff Edward Chavez, Jr. falsified the application form claiming he was not married when, in fact, he was.  Even though he was provided a hearing, he was unable to justify his position and he continued to take the position that he was unmarried for the purposes of claiming his domestic partner as a beneficiary under the provisions of the health insurance policy.  This was wrong.  After conducting a comprehensive hearing, it was my recommendation that he be terminated.  It was my determination after hearing the evidence that Plaintiff Edward Chavez, Jr. was less than candid about his situation.  He was attempting to place his domestic partner on the health insurance application to inappropriately obtain health insurance benefits for her.

Defs.' Ex.1, Padilla Aff. ¶9, ¶10, ¶11 (emphasis added).  The transcript of the hearing indicates

Plaintiff testified as follows:

Mr. Rodriguez:  Okay.  On September 16th, '05, when you listed yourself as Marital Status No. 5, as single, were you single, or were you married?

Mr. Chavez:  I was single.

Mr. Rodriguez:  So you were already divorced then.

Mr. Chavez:          No.  I believe that it says, on the IRS form, W-4 Form, Section No. 3 says,

                     Single, Married, Married but Withhold the Higher Single Rate; Note:  <u>If</u>

                     <u>married but legally separated or spouse is a non-resident alien, check Single</u>

                     <u>Box</u>.  So the time frame with when I left the house to get my divorce

                     finalized, which was finalized October 31, 2005, I considered myself to be

                     single.

Mr. Rodriguez:       But you were legally married.

Mr. Chavez:          I was legally separated.

Mr. Rodriguez:       Well– Okay.

Mr. Caldwell:        Just for clarification, please–

Mr. Chavez:          In my opinion, this is my opinion, I considered myself to be legally

                     separated.  In the divorce decree, which I haven't got a copy of the final, it

                     had to be submitted to Judge Driggers today, so I don't have the signed

                     copy or the stamped copy, it was listed that the parties were married on or

                     about January 13th, 1987, and <u>permanently separated on or about April</u>

                     <u>11th of 2003</u>.

Mr. Caldwell:        Unfortunately, this is an informal proceeding, so we can kind of go back

                     and forth and say, All right, here's the deal.

Hearing Officer:     Yes, that's fine.

Mr. Caldwell:        The legal status of someone who's legally separated is, they're still

                     married; that's the law.  <u>And I'm not quite sure, but I understand what</u>

                     <u>you're saying is, you're relying on an IRS form which really is unrelated</u>

16

<u>and irrelevant to this application you filled out.  Did you ask anybody when</u>
<u>you filled this out, Look, I'm legally separated; which of these blocks</u>
<u>should I check</u>?

Mr. Chavez:       <u>Yes, I asked the lady when I went to the hearing– or that meeting at the</u>
<u>Elks Lodge, I says, I had my ex-wife, my divorce is getting finaled (sic)</u>
<u>soon, and this is my fiancee</u>.  Can I go ahead and put her on the new
insurance?  'Cause there was nothing in my divorce papers that said I had
to continue carrying my soon-to-be-ex-wife.

Mr. Caldwell:     Okay.  All right.  And I agree, if your divorce papers or separation papers
say you don't have to insure your– your wife or who's soon to be your ex-
wife, that's okay.  But the issue for the County is, you checked Married–
you checked Single when, technically under the law, you were still married.
The marriage is not over until the divorce is signed by the judge.  And
that's the basis of why we're here today.

Mr. Chavez:       <u>Well, I considered myself to be legally separated</u>.

Mr. Caldwell:     All right.

Mr. Chavez:       <u>So to say that I knowingly and with intent to put Single on there to defraud</u>
<u>the County in my opinion is not correct, because I didn't knowingly and</u>
<u>with intent set out to defraud anybody.  And if Mr.Rodriguez or anybody</u>
<u>else in town had called me up and said that there's a problem on your</u>
<u>application, could you come down to Human Resources and let's go over</u>

your paperwork, then I would have explained it to that at that time.  But I didn't knowingly with intent set out to defraud anybody.

**   **   **   **   **   **

Mr. Caldwell:     Okay.  How did you list– how did you decide to list yourself as single on the other form?  What was– what was the event that you believe changed you from being divorced back to being single?  Or did you think they're the same thing?

Mr. Chavez:       This W-4 Form that the IRS states if you are legally separated, then you check the Single box.

Mr. Caldwell:     So you're – Okay.  You believe that the IRS form is related to how you would fill out an insurance application form?

Mr. Chavez:       Yes.

Mr. Caldwell:     Why do you believe that?

Mr. Chavez:       If I could be single for this purpose, then why can't I be single for anything else?  I didn't – I didn't You know, **I'm not an attorney**, see.  I don't – **I don't, you know, understand a lot of these forms and stuff**, and we were told to fill them out, we filled them out, we submitted them, the ladies, when we turned them in across the street, said that if there was a problem on the application with anything, they would contact us to come in, go over it.  Never happened.

**   **   **   **   **   **

Mr. Caldwell:     Were you still married?

18

Mr. Chavez:          Yeah, pending a divorce.

Mr. Caldwell:        And you remained married until the date the court signed that degree.

Mr. Chavez:          Yes.

Mr. Caldwell:        And you knew that.

Mr. Chavez:          Legally, yes.

Mr. Caldwell:        And when you filled out these forms applying for the insurance coverage

                     for Ms. Armendariz, you knew that technically you were still married.

Mr. Chavez:          That's when I had found out that I would– I could consider myself single,

                     even though my divorce had not become final yet; it was in the final stages.

Mr. Caldwell:        And when you say you found out, are you saying that's when you read this

                     form and that caused you to believe that you could do that?

Mr. Chavez:          Well, I asked the lady that did the training there at the Elks Lodge.  I says,

                     My divorce is in the final stages, this is my – my domestic partner, can I list

                     her as my insurance part– my partner?  And she said, if you meet the

                     criteria–

Hearing Officer:     Which criteria is that, Mr. Chavez?

Mr. Chavez:          That was listed on the – on the form.

Mr. Lusk:            Probably the affidavit–

Mr. Chavez:          Yes.

Mr. Lusk:            – the affidavit of domestic partnership?

Mr. Chavez:          She didn't have an affidavit of domestic partnership; I drove down here and

got one here, read it over, filled it out, had a notary notarize it and

resubmitted it with our packet.

Hearing Officer:     Okay.

Mr. Rodriguez:       And in relation to that–

Hearing Officer:     Does everybody have that affidavit in their file?

Mr. Rodriguez:       Yes.  Uh-huh.  In – in this packet.  It's listed right after the enrollment

form, and it lists the criteria you should have in order to qualify for

domestic partnership.  And No. 4 is "neither of us is married or a member

of another domestic partnership," when in fact, sergeant– the sergeant was

married on 9-16-05.  And now I think we understand that you were– it was

pending a divorce, but nonetheless, what you were signing was an affidavit

that you were not married.

Mr. Caldwell:        So when she answered your question to meet all the criteria; you didn't

meet all the criteria.

Mr. Chavez:          **I believed at the time that I did**.

Mr. Caldwell:        Well—

Mr. Chavez:          **Now I understand what you're saying.  I understand what you're**

**saying**.

Mr. Caldwell:        All right.

Mr. Chavez:          **But to tell me that I knowingly and with intent tried to defraud the**

**County, I don't believe is correct 'cause I never knowingly, with**

20

**intent.  I believed that when I filled this out, I filled it out correctly**.

Now, if there was any problems with me filling this out, I believe that the people that receive the application from Human Resources should have called me back at that time and said, Well, look, do you have any proof of this?

Defs.' Ex. D to Ex. 1 (Transcript of Pretermination Hearing)(emphasis added).  Thus, Plaintiff testified at his pretermination hearing that he mistakenly relied on IRS W-4 Form to complete his insurance forms and was adamant he did not intend to defraud Doña Ana County.[2]  Like the other two employees who "assumed they were married under the provisions of common law," Plaintiff assumed he was single under the provisions of the IRS.  However, unlike the other two employees that "did not understand the requirements" to qualify for insurance coverage under Doña Ana County's new health insurance carrier, Plaintiff was not given the opportunity to make restitution to Doña Ana County and was not allowed to maintain his job.  Viewing all the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has raised a fact issue

---

[2] Defendants submitted evidence showing Plaintiff signed a "Drop Dependant" form on July 26, 2005.  See Defs.' Mem. in Support of Mot. for S.J.; Ex. 4 & Ex. 3 (Chavez Depo.), pgs. 52-54.  On this form, under marital status, Plaintiff checked "Divorced."  Although he was not divorced on this date, Plaintiff explained he considered himself divorced since his lawyer had advised him that "when you leave your house, the State of New Mexico considers you to be legally separated."  *Id*., Ex. 3 (Chavez Depo.) pg. 60.  On July 26, 2005, Plaintiff has nothing to gain by checking off  "Divorced" as his marital status.  This evidence tends to support Plaintiff's position that he believed he could consider himself single or divorced once he left his wife and not that he intended to defraud Doña Ana County when he signed the September 15, 2005 Affidavit of Domestic Partnership.

21

as to whether Defendants discriminated against him by regarding him as unable to perform the activity of working due to his cancer diagnosis.[3]

The final prong of the test requires Plaintiff to present some affirmative evidence that disability was a determining factor in Doña Ana County's decision. *Morgan*, 108 F.3d at 1323. "This burden is not onerous." *Id.* at 1324 (internal citations omitted). Plaintiff "must present evidence that, if the trier of fact finds it credible, and the employer remains silent, [he] would be entitled to judgment as a matter of law." *Id.* Here Plaintiff has presented sufficient evidence that his employment was terminated under circumstances giving rise to an inference of discrimination.

Once Plaintiff has met his burden of demonstrating a genuine issue of fact as to each aspect of his prima facie case, the burden shifts to Defendants to offer a legitimate reason for terminating Plaintiff's employment. Defendants assert they terminated Plaintiff's employment because Plaintiff falsified information on his health insurance application form. Thus, Defendants have carried their burden. Plaintiff must then establish a genuine dispute as to whether Defendants' explanation for his termination was pretextual. As noted above, Plaintiff testified at his pretermination hearing that he mistakenly relied on IRS W-4 Form to complete his insurance application forms and was adamant he did not intend to defraud Doña Ana County. Plaintiff contends Defendants' explanation for his termination is pretextual because Defendants

---

[3] Defendants contend there is no evidence they knew Plaintiff suffered from a disability at the time of his termination. However, Plaintiff contends he informed Doña Ana County of his renal cell carcinoma the day after his pretermination hearing. Moreover, Plaintiff's November 16, 2005 CT scan indicated renal cell carcinoma. Compl. Ex. C. Thus, at the time of the County Manager's decision to terminate (December 7, 2005), Defendants were aware of Plaintiff's renal cell carcinoma. It is of no consequence that the hearing officer attests that "[a]t no time during the pendency of the hearing was [she] aware of any . . . medical conditions relating to Edward Chavez, Jr." Ex. 1, Padilla Aff. ¶24. This is so because she was not the final decisionmaker in this case.

did not terminate two other employees charged with the same offense.  The evidence shows that

two other county employees who "assumed they were married under the provisions of common

law" and also provided false information on their insurance application forms were excused

because they "did not understand the requirements" to qualify for insurance coverage under Doña

Ana County's new health insurance carrier.  These employees were allowed to make restitution to

the county and were allowed to maintain their job.  This evidence suffices to support Plaintiff's

pretext argument.  *See Morgan*, 108 F.3d at 1324 ("A satisfactory showing that similarly situated

employees, who do not belong to the protected class, were treated differently with regard to

violation of a work rule could have lent support to the pretext argument.").  Accordingly,

summary judgment is precluded as to Plaintiff's ADA claim.

## C.  Retaliation Claim Under the ADA

In addition to prohibiting discrimination based on disabilities, the ADA also prohibits

retaliation for engaging in ADA related conduct. Under the ADA,

> It is unlawful to discriminate against any individual because that individual has opposed any
> act or practice made unlawful by this part or because that individual made a charge, testified,
> assisted, or participated in any manner in an investigation, proceeding, or hearing to enforce
> any provision contained in this part.

29 C.F.R. § 1630.12(a).

The retaliation provision was clearly enacted to prevent employers from terminating

employees who become advocates for the ADA.  No person should be retaliated against for

supporting any cause related to the ADA.  In order to establish a prima facie case of retaliation

under the ADA, the plaintiff must show (1) that he was engaged in protected activity; (2) an

adverse action by the employer either after or contemporaneous with the employee's protected

action; and (3) a causal connection between the employee's action and the employer's adverse action.  *Morgan*, 108 F.3d at 1324.

In Defendants' Memorandum in Support of Their Motion for Summary Judgment, Defendants move the Court for summary judgment as to Plaintiff's retaliation claim under the ADA "because Plaintiff Chavez cannot satisfy his burden to establish a prima facie case of disability discrimination."  Defs.' Mem. in Support of Mot. for S.J. at 8.  Specifically,

> Defendants state that Plaintiff Chavez is unable to satisfy the first or third element because there is no evidence that Defendants based their decision to terminate him based on any claimed disability or resulting retaliation.  Moreover, no information relating to an alleged disability or retaliation was raised at the pre-termination hearing.

*Id.* 8-9.  Because Defendants mistakenly relied on the Court granting their motion for summary judgment as to Plaintiff's ADA claim, they failed to set forth any argument(s) or evidence in support their motion for summary judgment as to Plaintiff's ADA retaliation claim.  Accordingly, the Court will deny Defendants' motion for summary judgment as to this claim at this time.

## D.  New Mexico Tort Claims Act (NMTCA)

Plaintiff's Complaint alleges state tort claims of tortious interference with an employment relationship and intentional infliction of emotional distress.  Defendants move for summary judgment as to these claims asserting "these are not torts which are waived in NMSA 1987, § 41-4-5 through 41-4-12 (1996)."  Defs.' Mem. in Support of Mot. for S. J. at 18.  In his response, Plaintiff failed to respond in any fashion to Defendants' assertion.  Nonetheless, Defendants are correct that Plaintiff's state tort claims are not torts for which sovereign immunity has been waived.  *See* N.M.Stat.Ann. §§ 41-4-5 through 41-4-12.  Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's  state tort claims.

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment is granted as to Plaintiff's due process claims and New Mexico Tort Claims Act claims and denied as to Plaintiff's ADA claims.


_____

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**